Stephen H.M. Bloch (UT #7813)
Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
steve@suwa.org
landon@suwa.org

Attorneys for Plaintiffs
*Southern Utah Wilderness Alliance and Living Rivers*

Diana Dascalu-Joffe (*pro hac vice* pending)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop St., Ste. 421
Denver, CO 80202
Tel: (702) 925-2521
ddascalujoffe@biologicaldiversity.org

Attorney for Plaintiff
*Center for Biological Diversity*

---

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, SOUTHERN REGION OF THE CENTRAL DIVISION**

| | |
|---|---|
| LIVING RIVERS, SOUTHERN UTAH WILDERNESS ALLIANCE, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>v.<br><br>KENT HOFFMAN, in his official capacity as Deputy State Director, Division of Lands and Minerals, UNITED STATES DEPARTMENT OF THE INTERIOR, and UNITED STATES BUREAU OF LAND MANAGEMENT,<br><br>    Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Case No. 4:19-cv-00074-DN<br><br>Judge David Nuffer |

## INTRODUCTION

1.      This lawsuit challenges eight separate decisions by the Bureau of Land Management ("BLM") to offer for development 130 oil and gas leases covering 175,357 acres of public lands in Utah without analyzing the greenhouse gas ("GHG") and climate change impacts of those decisions.[1]

2.      Shortly after Donald J. Trump took office in January 2017, the BLM nationally implemented new policies to "streamline" oil and gas leasing to align with the President's "energy dominance" agenda. Among other things, BLM's agenda took steps to: (1) eliminate opportunities for public engagement in the agency's leasing decisions, (2) eliminate the agency's obligation to fully analyze site-specific impacts of leasing and development, and (3) eliminate any additional BLM-identified "burden" on oil and gas leasing and development.

3.      Utah-BLM has dutifully implemented the Trump administration's energy dominance agenda. Since the start of 2017 the number of leases BLM has offered for sale in Utah has increased more than seven-fold compared to a similar timeframe during the Obama administration.

4.      The leases at issue in this litigation are located on public lands throughout Utah, primarily in the eastern and central parts of the state. Included in this litigation are leases scattered across the Colorado Plateau including adjacent to the Green River and White River, the Book Cliffs in the southern Uinta Basin, and the San Rafael Swell. It also includes leases in and near areas of remarkable cultural, historical, and archaeological significance including Nine Mile Canyon and Molen Reef.

---

[1] The leases at issue in this lawsuit are listed in Exhibit 1. A map of the challenged leases is provided in Exhibit 2.

5.      The majority of leases at issue in this complaint encompass lands identified by BLM as possessing wilderness characteristics; that is, BLM has determined that the lands appear natural and undisturbed and provide outstanding opportunities for solitude and unconfined primitive types of recreation such as hiking, wildlife viewing, and camping. This includes, but is not limited to, the Bitter Creek, Desolation Canyon, Dragon Canyon, Eagle Canyon, and White River lands with wilderness characteristics areas.



(The Dragon Canyon lands with wilderness characteristics area – an area encompassed by several leases at issue in this litigation. Copyright Ray Bloxham / SUWA).



(The White River lands with wilderness characteristics area – an area encompassed by several leases at issue in this litigation. Copyright Ray Bloxham / SUWA).



(The Eagle Canyon lands with wilderness characteristics area in the Molen Reef region of the San Rafael Swell – an area encompassed by several leases at issue in this litigation. Copyright Ray Bloxham / SUWA).

6.      Development activities on these leases including, but not limited to, road construction, well pad construction, drilling, and production will result in significant amounts of GHG emissions such as carbon dioxide, methane, and nitrous oxide. Moreover, activities occurring after production will also result in significant amounts of reasonably foreseeable GHG emissions through pipeline and infrastructure leaks and combustion of the produced natural gas and crude oil. GHG emissions from oil and gas produced on BLM-managed public lands contributes to, and is a significant driver of, the climate crisis.

7.      BLM did not analyze the direct, indirect, or cumulative impacts of the GHG emissions from its leasing decisions to climate change. BLM's failure to take the required "hard look" at these impacts violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-

4370h; the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-559, 701-706; and the regulations and policies that implement these laws.

8.      Accordingly, Plaintiffs seek a declaration that BLM's decisions to offer these leases for oil and gas development were arbitrary, capricious, and contrary to law.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgement); 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 553, 702 and 706 (APA).

10.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

11.     Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issue are situated in this district.

## PARTIES

12.     Plaintiff LIVING RIVERS is a non-profit environmental membership organization, based in Moab, Utah. Living Rivers promotes river restoration and seeks to revive natural habitat and the spirit of rivers by undoing the extensive damage done by dams, diversions and pollution on the Colorado Plateau. Living Rivers articulates a conservation ethic of achieving ecological restoration balanced with meeting human needs. Living Rivers regularly comments on and protests proposed BLM activities, including oil and gas lease sales. Living Rivers' members benefit from BLM's compliance with federal laws, including NEPA. Living Rivers brings this action on its own behalf and on behalf of its members.

13. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("Alliance") is a non-profit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah and the management of wilderness-quality lands in their natural state for the benefit of all Americans. The Alliance is headquartered in Salt Lake City, Utah, has offices in Moab, Utah and Washington. D.C., and has roughly 15,000 members in all fifty states and several foreign countries.

14. The Alliance's members use and enjoy public lands throughout Utah for a variety of purposes, including recreation, wildlife viewing, cultural appreciation, and aesthetic appreciation. The Alliance promotes local and national recognition of the region's unique character through research and public education and supports administrative and legislative initiatives to permanently protect Utah's wild places. The Alliance's members benefit from BLM's compliance with federal laws, including NEPA. The Alliance's members expect that BLM will comply with all federal environmental laws including NEPA and its action forcing mechanisms in order to make an informed decision. The Alliance regularly comments on and protests oil and gas lease sale decisions by the BLM, including those at issue here.

15. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit environmental organization with over 63,000 members, including 587 in Utah. The Center maintains an office in Utah. The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to advocate for increased protections for species and their habitats in Utah. The Center regularly comments on and protests oil and gas lease sale decisions by the BLM, including those at issue here.

16. Plaintiffs are collectively referred to from this point on as "SUWA."

17.     SUWA members frequently visit and observe public lands throughout Utah. For example, Mr. Ray Bloxham, an employee and member of the Alliance, and a member of both Living Rivers and the Center has visited and/or observed the public lands at issue in this lawsuit on numerous occasions since 1999, and most recently in July 2019. He has plans to return to public lands at issue in this litigation within the next few months and intends to continue to visit each of the areas for years to come. Mr. Bloxham particularly enjoys the incredible scenic views and remote and largely untrammeled nature of these public lands, abundant wildlife, and cultural and archaeological resources on his visits to these areas. SUWA brings this action on its own behalf and on behalf of its members.

18.     SUWA and its members' interests have been affected and irreparably harmed, and continue to be affected and harmed, by BLM's decisions to offer, sell, and issue the oil and gas leases at issue in this case. The development of these leases including, but not limited to, construction of access roads and well pads, noise and GHG emissions from vehicles and drill rigs, and industrialization of these remote areas will cause immediate, as well as sustained and prolonged damage to the environment. This will impair SUWA's members' use and enjoyment of these public lands, as well as adjacent public lands. SUWA members' also have a substantial interest in seeing that BLM complies with its procedural and substantive legal obligations and policies. The relief sought herein will redress these harms.

19.     Defendant KENT HOFFMAN is sued in his official capacity as Deputy State Director, Division of Lands and Minerals, of BLM's Utah State Office. Deputy State Director Hoffman is responsible for overseeing Utah BLM's minerals program, including the BLM field offices where the oil and gas leasing decisions at issue in this lawsuit are located. He signed the

8

Decision Records ("DR"), Findings of No Significant Impact ("FONSI"), and Protest Decisions denying Plaintiffs' protests for each of the lease sales at issue.

20.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal agency responsible for protecting and managing much of this country's natural resources, public lands, and cultural heritage. The Department of the Interior is responsible for ensuring that BLM's management of the nation's public lands is in accordance with federal laws, including NEPA.

21.     Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States within the Department of the Interior. BLM is responsible for managing publicly-owned lands and minerals, in accordance with federal law. BLM is the agency that manages and leased the public lands in Utah at issue in this case.

## LEGAL FRAMEWORK

### Administrative Procedures Act

22.     The APA authorizes judicial review of agency actions and provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

### National Environmental Policy Act

23.     NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decisionmaking by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that

agencies inform the public that they have considered environmental concerns in their decisionmaking. *See id.* § 1500.1(c).

24.     NEPA achieves its purpose through action forcing procedures that require agencies take a hard look at environmental consequences of their actions and authorizations.

25.     The Council on Environmental Quality ("CEQ") regulations implementing NEPA require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

26.     Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a). "In the fluid minerals program, this [irreversible] commitment occurs at the point of lease issuance." BLM, H-1624-1 Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013).

27.     To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS") must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

28.     An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

29.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact. *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

30.     An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity." *Id.* § 1508.27. "Context" refers to the scope of the proposed action, including the affected interests. *Id.* § 1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including but not limited to, "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.*

31.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action to inform its decision about whether the agency must prepare an EIS because a proposed action significantly impacts the environment. *Id.* §§ 1502.16(a) and (b), 1508.7, 1508.8.

32.     Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a).

33.     Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

34.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

35.     NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS or EA for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS or EA, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* 1502.20.

36.     The Department of the Interior's NEPA regulations for using tiered documents specify that site-specific EAs "can be tiered to programmatic or other broader-scope [EIS or EA]." 43 C.F.R. § 46.140(c). As a general rule, an EA that tiers to another NEPA document "must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions. *Id.* § 46.140. If the prior (in some instances programmatic) EIS or EA analyzes the impacts of the site-specific action, the agency is not required to perform additional analysis of impacts. *Id.* § 46.140(a). However, if the impacts analysis in the programmatic EIS or EA "is not sufficiently comprehensive or adequate to support further decisions," BLM's site-specific EA must acknowledge this and provide additional analysis. *Id.* § 46.140(b).

37.     The Department of the Interior's NEPA regulations contemplate that BLM may consider whether existing EISs or EAs "adequately assess[] the environmental effects of the proposed action and reasonable alternatives." *Id.* § 46.120(c). If so, BLM may rely on an administrative document, called a Determination of NEPA Adequacy ("DNA") to fulfill its NEPA obligations. *See id.* To rely on a DNA, an agency must evaluate "whether new

circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* BLM must explain why "any previously unanalyzed effects are not significant." *Id.* § 46.140(c).

38.     DNAs are not NEPA documents, do not contain NEPA analysis, and are not expressly identified in CEQ's NEPA regulations. They are instead an administrative convenience created by the Department of the Interior. As such, BLM's decision to rely on a DNA must rise or fall solely on the analyses contained in existing EISs and EAs.

**BLM's Oil and Gas Leasing and Development on Public Lands.**

39.     BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.

40.     First, BLM develops a land use plan, known as Resource Management Plan ("RMP"), specifying which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See* 43 U.S.C. § 1712(a). An RMP does not mandate leasing any specific lands for oil and gas development.

41.     Second, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. § 1610.5-3; *id.* §§ 3120-3120.7-3. BLM has considerable discretion to determine which lands will be leased and is not obligated to offer any particular tract of public land that has been nominated for leasing. The issuance of a surface occupancy lease gives the lessee a right to use some of the land for oil and gas development. *Id.* § 3101.1-2.

42.     Third, lessees must submit, and BLM must approve, applications for permits to drill before a lease may be developed. *Id.* § 3162.3-1(c). If a lease was issued without non-waivable no-surface occupancy stipulations then BLM cannot outright prohibit surface development on that lease. *Id.* § 3101.1-2.

13

# FACTUAL BACKGROUND

## The Climate Crisis.

43.     The climate crisis has been intensively studied and acknowledged at global, national, and regional scales. The scientific evidence is clear and compelling – climate change is being fueled by the human-caused release of GHG emissions, in particular carbon dioxide and methane.

44.     Carbon dioxide is the leading cause of climate change and the most emitted GHG in the United States. According to a 2019 United States Environmental Protection Agency ("EPA") report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2017*, carbon dioxide comprised 81.6 percent of total U.S. GHG emissions, or 5.270 billion metric tons.[2] "The largest source of [carbon dioxide], and overall [GHG] emissions, was fossil fuel combustion." *Id.* at ES-8. "Within the United States, fossil fuel combustion accounted for 93.2 percent of [carbon dioxide] emissions in 2017." *Id.* at ES-10. Carbon dioxide emissions "from fossil fuel combustion has accounted for approximately 77 percent of [global warming potential]-weighted emissions since 1990." *Id.*

45.     The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. The IPCC has identified the heat-trapping effect of methane—or global warming potential—as 36 times more potent than carbon dioxide over a 100-year period and 87 times more potent over a 20-year period. Future oil and gas development on the challenged leases has the potential to significantly increase methane emissions in Utah.

---

[2] Report available at https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2017 (last visited Sept. 11, 2019).

46.    In a 2014 summary to policymakers, the IPCC provided a summary of our

understanding of human-caused climate change. Among other things, the IPCC stated:

- Human influence on the climate system is clear, and recent anthropogenic
  emissions of greenhouse gases are the highest in history. Recent climate changes
  have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the
  observed changes are unprecedented over decades to millennia. The atmosphere
  and ocean have warmed, the amounts of snow and ice have diminished, and sea
  level has risen.

- Anthropogenic GHG emissions have increased since the preindustrial era, driven
  largely by economic and population growth, and are now higher than ever. This
  has led to atmospheric concentrations of carbon dioxide, methane, and nitrous
  oxide that are unprecedented in at least the last 800,000 years. Their effects,
  together with those of other anthropogenic drivers, have been detected throughout
  the climate system and are extremely likely to have been the dominant cause of
  the observed warming since the mid-20th century.

- In recent decades, changes in climate have caused impacts on natural and human
  systems on all continents and across the oceans. Impacts are due to observed
  climate change, irrespective of its cause, indicating the sensitivity of natural and
  human systems to changing climate.

- Continued emission of greenhouse gases will cause further warming and long-
  lasting changes in all components of the climate system, increasing the likelihood
  of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting
  climate change would require substantial and sustained reductions in GHG
  emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed
  emission scenarios. It is very likely that heat waves will occur more often and last
  longer, and that extreme precipitation events will become more intense and
  frequent in many regions. The ocean will continue to warm and acidify, and
  global mean sea level will continue to rise.[3]

47.    More recently, the IPCC reaffirmed the severe impacts from the climate crisis and that

rapid action away from fossil fuels is needed if we are to limit the impacts of climate change:

---

[3] IPCC AR5, *Summary for Policymakers* (March 2014), https://www.ipcc.ch/report/ar5/syr/ (follow hyperlink for
"Summary for Policymakers") (last visited Sept. 11, 2019).

- Human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, with a likely range of 0.8°C to 1.2°C. Global warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.

- Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts but these emissions alone are unlikely to cause global warming of 1.5°C.

- Climate models project robust differences in regional climate characteristics between present-day and global warming of 1.5°C, and between 1.5°C and 2°C. These differences include increases in: mean temperature in most land and ocean regions, hot extremes in most inhabited regions, heavy precipitation in several regions, and the probability of drought and precipitation deficits in some regions.

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C.

- Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (medium confidence).[4]

48.     The western U.S. is particularly susceptible to the effects of climate change. The West is already experiencing increasing temperatures and prolonged droughts, with widespread impacts across our forests, wildlife, and human communities and threatening the region's resilience in the face of continued warming. Local economies, which are reliant on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses, have also seen significant adverse impacts.

---

[4] SR 15, *Global Warming of 1.5°: Summary for Policy Makers* (Oct. 2018), https://report.ipcc.ch/sr15/pdf/sr15_spm_final.pdf (last visited Sept. 11, 2019).

49.     With particular regard to the Southwest Region – which includes Utah – the Third

National Climate Assessment[5] provided the following overview:

- Snowpack and streamflow amounts are projected to decline in parts of the
  Southwest, decreasing surface water supply reliability for cities, agriculture, and
  ecosystems.

- The Southwest produces more than half of the nation's high-value specialty crops,
  which are irrigation-dependent and particularly vulnerable to extremes of
  moisture, cold, and heat. Reduced yields from increasing temperatures and
  increasing competition for scarce water supplies will displace jobs in some rural
  communities.

- Increased warming, drought, and insect outbreaks, all caused by or linked to
  climate change, have increased wildfires and impacts to people and ecosystems in
  the Southwest. Fire models project more wildfire and increased risks to
  communities across extensive areas.

- Projected regional temperature increases, combined with the way cities amplify
  heat, will pose increased threats and costs to public health in southwestern cities,
  which are home to more than 90% of the region's population. Disruptions to
  urban electricity and water supplies will exacerbate these health problems.

50.     The Fourth National Climate Assessment,[6] released in 2018, notes that temperatures

have already "increased across almost all of the Southwest region from 1901 to 2016,"

magnifying the impacts of drought and wildfire. For example, hotter temperatures have already

contributed to reductions in snowpack, amplifying drought conditions in the Colorado River

Basin. It is also estimated that the area burned by wildfire across the western United States

between 1984 and 2015 was twice what would have burned had climate change not occurred.

51.     Future projections for the region from the Fourth National Climate Assessment are

even more alarming. Climate change threatens to lead to "to aridification (a potentially

permanent change to a drier environment) in much of the Southwest, through increased

---

[5] Available at https://nca2014.globalchange.gov/report/regions/southwest (last visited Sept. 11, 2019). The National
Climate Assessment is prepared by the United States Global Change Research Program which is a collaboration of
thirteen federal agencies including BLM.
[6] Available at https://nca2018.globalchange.gov/ (last visited Sept. 11, 2019).

evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." Climate change-related drought has already had massive impacts on food production and the agricultural economy of rural areas in the Southwest, and poses a long-term threat to regional food security.

**BLM's Oil and Gas Leasing Program's
Significant Contribution to the Climate Crisis.**

52.     BLM's oil and gas leasing program contributes vast amounts of GHG pollution to the atmosphere. BLM manages nearly 700 million acres of subsurface minerals, and estimates that about half of this federal mineral estate contains oil and/or natural gas. Currently, over 25 million acres of federally managed lands are leased for oil and gas development.

53.     According to the United States Geological Survey ("USGS"): "Nationwide emissions from fossil fuels produced on Federal lands in 2014 were 1,279.0 million metric tons of carbon dioxide equivalent (MMT $CO_2$ Eq.) for [$CO_2$], 47.6 MMT CO2 Eq. for methane . . . and 5.5 MMT CO2 Eq. for nitrous oxide."[7] These emissions totals represent "23.7 percent of national emissions for $CO_2$, 7.3 percent for [methane], and 1.5 percent for [nitrous oxide] over" a ten year period.[8] For comparison, in 2016, the state of Utah's total $CO_2$ emissions **from all sectors** (e.g., transportation, residential, energy) amounted to approximately 59.1 million metric tons in 2016.[9] In other words, it would take Utah, at current emission levels, **more than twenty-one years** to release the same amount of $CO_2$ emissions (from all sectors) as are emitted as a result of fossil fuel development on public lands in a single year.

---

[7] USGS, Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-14 at 1 (2018), https://pubs.usgs.gov/sir/2018/5131/sir20185131.pdf (last visited Sept. 11, 2019).
[8] *Id.*
[9] United States, Energy Information Administration, State Carbon Dioxide Emissions Data (Oct. 31, 2018), https://www.eia.gov/environment/emissions/state/ (follow hyperlink for "Utah").

54.     In a recent report, The Wilderness Society ("TWS") explained that the Trump administration has leased "more public lands . . . for fossil energy development than any administration in history." TWS, *Measuring the climate impact of Trump's reckless leasing of public lands* at 1 (July 2019).[10] The report summarized its conclusion regarding the climate change impact of this "energy dominance" agenda, as follows:

> Under varying future market conditions, development of leases issued during the Trump administration has the potential to result in lifecycle emissions – those resulting from the extraction and end-use combustions of fossil fuels – ranging between 854 million and 4.7 billion metric tons of carbon dioxide equivalent ($CO_2e$). That equates to more than the total GHG emissions stemming from all 28 member countries of the European Union for an entire year.

> *Id.*

55.     Notably, according to the TWS report, the state of Utah based on its complex geology, among other factors, has the *highest* lifecycle GHG emissions (*i.e.,* emissions resulting from extraction through end-use combustion) of all states with public lands managed by BLM. *See id.* at 5, fig. 4. In fact, Utah's potential lifecycle GHG emissions are *forty-three* percent of the anticipated emissions from all states that contain BLM-managed public lands. *Id.*

56.     The TWS report highlighted the urgency of taking action to prevent the worst outcomes of the climate crisis. "To stay on pace with the reductions demanded by climate science, we must reduce emissions by approximately 12.5 billion MT $CO_2e$ by 2030." *Id.* at 7. However, "the potential carbon emissions associated with the federal leases issued during just two years of the Trump administration represent around 38% of the burnable carbon allowed under a federal budget aligned with the 1.5-degree goal." *Id.*

---

[10] Available at https://www.wilderness.org/articles/reports/report-measuring-climate-impact-trumps-reckless-leasing-public-lands (last visited Sept. 11, 2019).

57.     According to BLM's most recent data, the agency has more than 2.5 million acres of

public lands in Utah under lease for oil and gas development; 394,000 of those acres have been

leased since President Trump came to office in 2017.[11]

**The Trump Administration's Attacks on Climate Change Science.**

58.     The Trump administration has repeatedly attacked, and continues to attack, the well-

established science and data supporting the climate crisis and restricted federal agencies' abilities

to research, disseminate, or rely on scientific data and information related to the climate crisis.

The Union of Concerned Scientists ("Concerned Scientists") maintains a running list of these

growing attacks on science.[12] This list includes, but is not limited to:

- Delaying a United States Geological Survey press release on climate change for months and then releasing a highly edited version that removed references to the study's main findings.[13]

- Restricting the public's access to climate change research.[14]

- Suppressing climate science from Congressional testimony.[15]

- Ordering federal agency scientists to conduct less accurate climate change science.[16]

---

[11] Data available at https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/oil-and-gas-statistics (select hyperlink for Table 2 Acreage in Effect) (last visited Sept. 11, 2019).
[12] Available at https://www.ucsusa.org/center-science-and-democracy/attacks-on-science (last visited Sept. 11, 2019).
[13] *See* Concerned Scientists, *Climate Change Research Downplayed at the U.S. Geological Survey*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/climate-change-research-downplayed-us-geological (July 17, 2019).
[14] *See* Concerned Scientists, *USDA Restricts the Public's Access to Climate Change Research*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/usda-restricts-public-s-access-climate-change (July 12, 2019).
[15] *See* Concerned Scientists, *The White House Suppressed Science from Congressional Testimony*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/white-house-suppressed-science-congressional (June 19, 2019).
[16] *See* Concerned Scientists, *Trump Administration Orders Scientists to Conduct Less Accurate Climate Change Science*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/trump-administration-orders-scientists-conduct-less (June 3, 2019).

- Restricting the use of scientific information by federal agencies to inform policies.[17]

- Hiding (or burying) information and data that shows the harms of oil and gas exploration and development to climate change, ecosystems, and threatened and endangered species.[18]

- Rescinding policies that promote science-based decisionmaking.[19]

- Restricting scientists, including those at the Department of the Interior, from attending or presenting at scientific conferences.[20]

59. President Trump himself has repeatedly questioned the clearly-established scientific link between GHG emissions and climate change. Mr. Trump has referred to the climate crisis as "mythical," "non-existent," an "expensive hoax," and "based on faulty science and manipulated data."[21]

60. The Trump administration's unofficial policy of climate change denial does not change reality or science.

**The Trump Administration and BLM's Energy Dominance Agenda.**

61. In keeping with the President's skepticism regarding the public health and well-being impacts of the climate crisis, the Trump administration has explicitly pursued a policy of

---

[17] *See* Concerned Scientists, *The White House Restricts Science, Potentially Causing the Best Available Science to Disappear from Policymaking*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/white-house-restricts-science-potentially-causing (May 20, 2019).
[18] *See* Concerned Scientists, *Scientists' concerns on oil and gas operations in Alaska are buried by the Trump administration*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/scientists-concerns-oil-and-gas-operations-alaska (April 12, 2019); Concerned Scientists, *Trump Administration Hides Oil Exploration Harms to Polar Bears*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/trump-administration-hides-oil-exploration-harms (Feb. 13, 2019).
[19] *See* Concerned Scientists, *Trump Administration Rescinds Policy that Promoted Science-Based Decision-making for National Parks*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/trump-administration-rescinds-policy-promoted (July 27, 2018).
[20] *See* Concerned Scientists, *DOI Restricts Scientists From Attending Scientific Conferences*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/doi-restricts-scientists-attending-conferences (July 10, 2018).
[21] Dylan Matthews, *Donald Trump has tweeted climate change skepticism 115 times. Here's all of it.*, Vox, June 1, 2017, https://www.vox.com/policy-and-politics/2017/6/1/15726472/trump-tweets-global-warming-paris-climate-agreement.

American "energy dominance," based on a dramatic expansion of fossil fuel development in the

country, at the expense of environmental protections and public participation in agency

decisionmaking.

62.     Two months after taking office President Trump issued Executive Order No. 13783,

entitled "Promoting Energy Independence and Economic Growth." *See generally* 82 Fed. Reg.

16093 (March 28, 2017). This Executive Order required administrative agencies, including

BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar

agency actions . . . that potentially burden the development or use of domestically produced

energy resources, with particular attention to oil [and] natural gas." *Id.*

63.     Soon thereafter, the Secretary of the Interior issued Secretarial Order No. 3354,

entitled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and

Federal Solid Mineral Leasing Program." *See generally* Sec. of the Interior, Order No. 3354

(July 5, 2017).[22] This order directed BLM to "identify additional steps to enhance exploration

and development of Federal onshore oil and gas resources." *Id.* § 3(b). It required further that

BLM "identify any provisions in [its] existing policy and guidance documents that would impede

BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration

and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

64.     In response to Executive Order 13783 and Secretarial Order 3354, BLM issued

Instruction Memorandum No. 2018-034, entitled "Updating Oil and Gas Leasing Reform – Land

Use Planning and Lease Parcel Reviews" (Jan. 31, 2018) [hereinafter, "IM 2018-34"].[23] IM

2018-34 replaced BLM's longstanding oil and gas leasing policy and established the framework

for how BLM would implement the Trump administration's energy dominance agenda. Among

---

[22] Available at https://www.doi.gov/sites/doi.gov/files/uploads/doi-so-3354.pdf (last visited Sept. 11, 2019).
[23] Available at https://www.blm.gov/policy/im-2018-034 (last visited Sept. 11, 2019).

other things, IM 2018-34: (1) eliminated or significantly restricted opportunities for public

involvement in oil and gas leasing decisions, and (2) encouraged BLM to rely on existing NEPA

analyses rather than prepare site-specific NEPA analysis in order to "streamline" oil and gas

leasing and development. *See id.* §§ II, III.B.5, III.D.

65.     With these perceived "burdens" on oil and gas leasing and development eliminated,

there has now been a more than seven-fold increase in the amount of public lands in Utah offered

for leasing and development by BLM over a similar timeframe under the Obama administration,

including the majority of the leases at issue in this litigation.

**BLM Is Forced to Suspend Certain Oil and Gas Leasing Decisions on Account of Its Failure to Fully Analyze GHG Emissions and Climate Change Impacts.**

66.     On March 19, 2019, Judge Contreras, of the United States District Court, District of

Columbia, issued his decision in *WildEarth Guardians v. Zinke* ("*WildEarth Guardians*"), 368 F.

Supp. 3d 41 (March 19, 2019). In his opinion, Judge Contreras held that BLM violated NEPA

when it failed to fully analyze all reasonably foreseeable GHG emissions and climate change

impacts of certain oil and gas leasing decisions for BLM-managed lands in Wyoming. Among

other things, BLM failed to (1) quantify GHG emissions of oil and gas leasing and development

(including downstream GHG emissions), and (2) analyze the GHG emissions of all past, present,

and reasonably foreseeable oil and gas leasing decisions for public lands across the United

States. *See id.* at 67-78.

67.     The court's decision in *WildEarth Guardians* has had broad ramifications across the

United States, including in Utah, with regard to oil and gas leasing and development. In response

to *WildEarth Guardians*, Utah-BLM has on three separate occasions recognized that its NEPA

analysis regarding GHG emissions and climate change analysis prepared to justify certain oil and

gas leasing decisions violated the law. This includes the NEPA analysis prepared for the Utah-BLM's March 2018, September 2018, and December 2018 oil and gas lease sales.

**The BLM Oil and Gas Leasing Decisions at Issue in this Litigation.**

68.     Over the past several years, BLM has offered, sold, and issued a web of oil and gas leases across the state of Utah. This includes, but is not limited to: (1) on the doorstep of national parks and monuments, (2) in areas with identified wilderness characteristics, (3) in areas of remarkable cultural and archaeological value and density, and (4) adjacent to the important waters including the Green River and White River.[24] BLM has not fully analyzed the impacts of these leasing decisions to the climate crisis.

*The November 2014 Lease Sale*

69.     Nineteen leases at issue in this litigation were offered, sold, and issued by BLM at the November 2014 lease sale. The leases are located in the Desolation Canyon lands with wilderness characteristics area, adjacent to the Green River, and/or near the entrance to Nine Mile Canyon – an area of world-renown cultural and archaeological significance.

70.     The Alliance protested BLM's leasing decision based on, among other factors, the agency's failure to analyze potential GHG emissions and climate change impacts. BLM denied the Alliance's protest.

71.     The BLM's leasing EA failed to analyze GHG emissions and climate change impacts, claiming that such analysis could not be conducted due to uncertainties and lack of scientific models. *See* BLM, Environmental Assessment, November 2014 Lease Sale, DOI-BLM-UT-G010-2014-093-EA at 34-35 (June 2014) ("November 2014 Lease Sale EA").[25] With regard to

---

[24] As noted *supra*, a map of the leases at issue in this litigation is attached as Exhibit 2.
[25] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/39487/49256/53597/Signed_Checklist.pdf (last visited Sept. 11, 2019).

cumulative GHG emissions and climate change impacts, the EA stated that "it is not technically feasible to know with any certainty the net impacts to climate due to global emissions, let alone regional or local emissions." *Id.* at 47.

72.     The EA did not quantify direct GHG emissions (*e.g*, the emissions from drilling each of the anticipated wells), indirect GHG emissions (*e.g.*, the end-use emissions such as from fugitive emissions during transportation or combustion of the produced natural gas or crude oil), or cumulative GHG emissions of other past, present, or reasonably foreseeable oil and gas lease sales in Utah, regionally, or nationally. Likewise, the EA did not analyze the impacts of the GHG emissions to climate change.

### *The December 2016 Lease Sale*

73.     Eighteen leases at issue in this litigation were offered, sold, and issued by BLM at the December 2016 lease sale. The leases are located, among other areas, in the Desolation Canyon lands with wilderness characteristics area and near the White River – a tributary to the Green River.

74.     The Alliance protested this lease sale. The Center and Living Rivers also filed a separate lease sale protest over this lease sale. Both of these protests argued that BLM failed to analyze potential GHG emissions and climate change impacts. BLM dismissed in part and denied in part both protests.

75.     The BLM's leasing EA failed to analyze reasonably foreseeable GHG emissions and climate change impacts. With regard to indirect GHG emissions, the EA stated: "Indirect GHG emissions are calculated **only** for carbon dioxide based on **combustion** of the product." BLM, Environmental Assessment, November 2016 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2016-033-EA at 42 (Feb. 8, 2017) (emphases added) ("December 2016 Lease Sale

EA").[26] In other words, BLM did not analyze emissions for GHGs other than carbon dioxide such as methane and nitrous oxide, and failed to analyze any GHG emission that occurs after drilling but prior to combustion (*e.g.*, fugitive emissions that leak from pipelines and infrastructure).

76.     For cumulative GHG emissions, the EA stated: "Since climate change and global warming are global phenomena, for purposes of this NEPA analysis, the analysis presented above about direct and indirect effects of GHG emissions from the proposed actions is also an analysis of the cumulative effects of the proposed actions." *Id.* at 59. Thus, BLM asserted that by having analyzed direct and indirect impacts it had also analyzed cumulative impacts for purposes of NEPA.

77.     The EA did not analyze downstream emissions for GHGs other than carbon dioxide such as methane and nitrous oxide, and failed to analyze any GHG emission that occurs after drilling but prior to combustion (*e.g.*, fugitive emissions that leak from pipelines and infrastructure). The EA did not quantify the cumulative GHG emissions of other past, present, or reasonably foreseeable oil and gas lease sales in Utah, regionally, or nationally. The EA also did not analyze the impacts of the GHG emissions to climate change.

   *The December 2017 Lease Sale*

78.     Fifteen leases at issue in this litigation were offered at the December 2017 lease sale. The leases are located in the Molen Reef region of the San Rafael Swell – an area of remarkable cultural and archaeological diversity and density. The leases also are in the Eagle Canyon lands with wilderness characteristics area.

---

[26] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/59590/97018/117174/Final_EA.pdf (last visited Sept. 11, 2019).

79.     The Alliance protested BLM's decision to offer these leases for oil and gas leasing and development. The Center and Living Rivers submitted a separate lease sale protest which explained that BLM failed to analyze potential GHG emissions and climate change impacts. BLM denied both protests.

80.     The BLM's leasing EA failed to analyze all reasonably foreseeable GHG emissions and climate change impacts. For example, with regard to indirect GHG emissions, BLM stated that "[i]ndirect GHG emissions are . . . only calculated for carbon dioxide based on combustion of the product." BLM, Environmental Assessment, DOI-BLM-UT-G020-2017-0030-EA, December 2017 Competitive Oil and Gas Lease Sale at 39 (Jan. 2018) ("December 2017 Lease Sale EA").[27]

81.     For cumulative impact analysis, the EA stated: "Since climate change and global warming are global phenomena, for purposes of this NEPA analysis, the analysis presented above about direct and indirect effects of GHG emissions from the proposed actions is also an analysis of the cumulative effects of the Proposed Action." *Id.* at 52.

82.     The EA did not analyze downstream emissions for GHGs other than carbon dioxide such as methane and nitrous oxide, and failed to analyze any GHG emission that occurs after drilling but prior to combustion (*e.g.*, fugitive emissions that leak from pipelines and infrastructure). The EA did not quantify the cumulative GHG emissions of other past, present, or reasonably foreseeable oil and gas lease sales in Utah, regionally, or nationally. The EA also did not analyze the impacts of the GHG emissions to climate change.

---

[27] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/80165/130450/158729/Final_Vernal_EA.pdf (last visited Sept. 11, 2019)

### *The March 2018 Lease Sale*

83.    Three leases at issue in this litigation were offered, sold, and issued by BLM at the March 2018 lease sale. The leases are located adjacent to the Labyrinth Canyon section of the Green River.

84.    SUWA protested this leasing decision. Among other issues, SUWA explained that BLM failed to analyze potential GHG emissions and climate change impacts. BLM denied SUWA's protest.

85.    BLM's leasing EA did not analyze all reasonably foreseeable GHG emissions and climate change impacts. Instead, for indirect effects the EA stated: "Indirect GHG emissions are . . . only calculated for carbon dioxide based on combustion of the product." BLM, Canyon Country District March 2018 Competitive Oil and Gas Lease Sale – Environmental Assessment, DOI-BLM-UT-Y010-2017-0240-EA at 44 (May 2018) ("March 2018 Lease Sale EA").[28] And for cumulative impacts, the EA stated: "Since climate change and global warming are global phenomena, the discussion of global impacts from climate change in the affected environment and impact sections of the EA is equivalent to a qualitative cumulative impact analysis." *Id.* at 71.

86.    The EA did not analyze downstream emissions for GHGs other than carbon dioxide such as methane and nitrous oxide, and failed to analyze any GHG emission that occurs after drilling but prior to combustion (*e.g.*, fugitive emissions that leak from pipelines and infrastructure). The EA did not quantify the cumulative GHG emissions of other past, present, or reasonably foreseeable oil and gas lease sales in Utah, regionally, or nationally. The EA also did not analyze the impacts of the GHG emissions to climate change.

---

[28] Available at https://eplanning.blm.gov/epl-front-office/projects/nepa/82261/144833/178528/2018-05-14_-_FY18_CCDO_Leasing_EA_FINAL.pdf (last visited Sept. 11, 2019).

### *The December 2018 Lease Sale*

87.     Seventy-five leases at issue in this litigation were offered at the December 2018 lease sale. This includes:

- Five leases in the Moab field office.

- One lease in the Monticello field office.

- Two leases in the Price field office.

- Sixty-seven leases in the Vernal field office.

88.     The majority of the leases are located in the Book Cliffs region of the southern Uinta Basin. This region is home to important big game habitat (*e.g.*, black bear and elk) and contains wilderness-caliber lands including the Bitter Creek, Dragon Canyon, Mexican Point, Sunday School Canyon, and Wolf Point areas.

89.     SUWA protested each of the four separate leasing decisions. Among other issues, SUWA's protests explained that BLM had failed to analyze the direct, indirect, and cumulative GHG emissions and climate change impacts of offering the December 2018 lease sale leases for oil and gas development. BLM denied each of SUWA's protests.

90.     BLM prepared DNAs to support its decisions to offer the Moab, Monticello, and Price field office leases ("December 2018 Lease Sale DNAs"), and an EA to support its decision to offer the Vernal field office leases ("December 2018 Lease Sale EA") for oil and gas development.[29]

91.     The Moab and Monticello field office DNAs tiered to the March 2018 Lease Sale EA, and the Price field office DNA tiered to the leasing EA prepared for the Utah-BLM September

---

[29] Available at https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=163298 (follow hyperlinks to respective leasing documents as directed from the homepage) (last updated Feb. 13, 2019).

2018 lease sale ("September 2018 Lease Sale EA") for NEPA analysis including GHG emissions and climate change. BLM has recognized that the March and September 2018 Lease Sale EAs failed to disclose or analyze these impacts. Despite this fact, BLM relied on those same unlawful analyses to support its December 2018 leasing decisions in the Moab, Monticello, and Price field offices.

92.     The December 2018 Lease Sale EA failed to analyze GHG emissions and climate change. Instead, BLM repeated the same mistakes it made in the leasing decisions discussed above. For example, with regard to indirect GHG emissions BLM analyzed only the "[carbon dioxide] emissions based on combustion of the product." December 2018 Lease Sale EA at 30. BLM did not analyze other GHG emissions or related impacts because, allegedly, "[a]ssessments of actual GHG emissions are not possible at the leasing stage since emissions are dependent on [a variety of factors]." *Id.* The EA did not analyze downstream emissions for GHGs other than carbon dioxide such as methane and nitrous oxide, and failed to analyze any GHG emission that occurs after drilling but prior to combustion (*e.g.*, fugitive emissions that leak from pipelines and infrastructure).

93.     The December 2018 Lease Sale EA did not quantify the cumulative GHG emissions of other past, present, or reasonably foreseeable oil and gas lease sales in Utah, regionally, or nationally. Instead, the EA provided only broad and generic statements regarding the nature of the climate crisis. *See id.* at 41. The EA also did not analyze the impacts of the GHG emissions to climate change.

        *SITLA Lease Sales 2014-Present*

94.     Over the past five years, the Utah School and Institutional Trust Lands Administration ("SITLA") has conducted numerous oil and gas lease sales for lands in Utah, including

immediately adjacent to BLM-managed public lands at issue in this litigation. BLM is aware of SITLA's oil and gas leasing activity in Utah.

95.    From 2014 – 2018, SITLA offered approximately 814 leases for oil and gas development in Utah.[30]

96.    BLM's aforementioned lease sale EAs and DNAs and accompanying FONSIs-DRs and DRs contain no mention of the SITLA lease sales or consider whether those sales when viewed together with BLM's leasing proposal(s) would have significant environmental impacts. None of BLM's EAs or DNAs and accompanying FONSIs-DRs and DRs analyzed the cumulative impacts of BLM's leasing proposals or SITLA lease sales including GHG emissions and climate change.

_Multiple Attempts by Plaintiffs to Settle This Lawsuit._

97.    SUWA attempted several times to resolve the issues at hand prior to bringing this litigation. For example:

- On June 12, 2019, counsel for SUWA e-mailed counsel for BLM regarding two-then pending IBLA appeals that involved certain leases offered and sold at BLM's December 2018 lease sale. Counsel for SUWA explained that BLM had recently recognized that the NEPA documents relied upon for the December 2018 lease sale failed to analyze all GHG emissions and climate change impacts. *See* E-mail from Landon Newell, the Alliance, to Cameron Johnson, Solicitor's Office (June 12, 2019). Counsel for SUWA requested that BLM set aside its leasing decisions and cancel the leases in order "to prepare the necessary 'curative' NEPA analysis." *Id.* One week later, counsel for SUWA e-mailed counsel for BLM and explained that if BLM did not set aside the leases at issue within thirty days SUWA would "file litigation in the district of Utah." E-mail from Landon Newell, the Alliance, to Cameron Johnson, Solicitor's Office (June 20, 2019). BLM did not respond to this e-mail.

- On June 13, 2019, the Alliance sent a letter to Utah-BLM leadership and explained that the agency had prepared and relied on inadequate GHG emissions and climate change analyses for multiple lease sales dating back as far as 2014,

---

[30] *See* SITLA, Competitive Mineral Lease Offerings & Results, https://trustlands.utah.gov/business-groups/oil-gas/competitive-mineral-lease-offerings/ (select the hyperlinks below the years 2014-2018) (last visited Sept. 11, 2019).

including leases at issue in this litigation. The Alliance explained that BLM must set aside each of these leasing decisions in order to prepare curative GHG emissions and climate change NEPA analysis. BLM did not respond to this letter.

- On July 10, 2019, the Alliance sent a follow-up letter to Utah-BLM leadership and highlighted BLM's recent decisions to suspend certain oil and gas leases based on inadequate GHG emissions and climate change analysis and explained that the agency's analyses for the other lease sales identified in the Alliance's June 13, 2019 letter "suffer[] from the exact same flaw." Letter from Stephen Bloch, and Landon Newell, the Alliance, to Ed Roberson, and Kent Hoffman, BLM at 2 (July 10, 2019). The Alliance stated that it would bring litigation in federal court if BLM did not take action by July 15, 2019 to set aside each of the leases identified in its letter. *Id.* Utah-BLM State Director Roberson eventually acknowledged receipt of the Alliance's July 10 letter but did not respond substantively to the points raised therein.

98.    BLM did not cancel, or suspend, the leases identified by SUWA – the same leases at issue in this litigation. BLM did not prepare curative NEPA analysis for any of these leases including for GHG emissions and climate change.

## FIRST CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze Indirect Effects*
*of Oil and Gas Leasing and Development.*

99.    SUWA incorporates by reference all proceeding paragraphs.

100.    NEPA requires BLM to take a "hard look" at the indirect effects of oil and gas leasing and development. *See, e.g.*, 40 C.F.R. 1508.8(b) (indirect effects).

101.    NEPA further requires that BLM in its analysis consider "[b]oth short- and long-term effects." *Id.* § 1508.27(a).

102.    BLM failed to analyze reasonably foreseeable indirect GHG emissions and climate change impacts from offering the leases at issue in this litigation for oil and gas development.

103.    The aforementioned lease sales and accompanying FONSIs-DRs and DRs violated NEPA's hard look mandate and were arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A).

32

## SECOND CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze Cumulative Impacts
of Oil and Gas Leasing and Development.*

104.    SUWA incorporates by reference all proceeding paragraphs.

105.    NEPA requires BLM to take a "hard look" at all cumulative impacts of oil and gas

leasing and development. *See* 40 C.F.R. § 1508.7.

106.    To determine whether a proposed action will have a significant impact, BLM must

consider, among other factors: "Whether the action is related to other actions with individually

insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). NEPA's implementing

regulations caution that "[s]ignificance cannot be avoided . . . by breaking it down into small

component parts." *Id.*

107.    The aforementioned lease sale EAs and DNAs and accompanying FONSI-DRs and

DRs did not consider or analyze the cumulative impacts of BLM's leasing decisions at issue in

this litigation. Nor did they consider SITLA's lease sales during this same timeframe. Instead,

BLM unlawfully broke its leasing decisions down into small component parts, without

considering the cumulative impact to resource values including GHG emissions and climate

change.

108.    The SITLA lease sales and BLM's lease sales at issue in this litigation constitute

"past, present, [or] reasonably foreseeable future actions."

109.    BLM's failure to analyze the cumulative impacts of its aforementioned eight leasing

decisions and proposals violates NEPA's hard look mandate and is arbitrary and capricious in

violation of the APA, 5 U.S.C. § 706(2)(A).

33

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgement in Plaintiffs' favor and against Defendants and provide the following relief:

1.  Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law by issuing the FONSIs-DRs and DRs at issue in this litigation.

2.  Declare unlawful and vacate the leasing decisions and accompanying EAs and DNAs and FONSIs/DRs at issue in this litigation. This includes:

    - The November 2014 Lease Sale EA and accompanying FONSI/DR;

    - The December 2016 Lease Sale EA and accompanying FONSI/DR;

    - The December 2017 Lease Sale EA and accompanying FONSI/DR;

    - The March 2018 Lease Sale EA and accompanying FONSI/DR;

    - The December 2018 Lease Sale DNAs and accompanying DRs; and

    - The December 2018 Lease Sale EA and accompanying FONSI/DR.

3.  Set aside and vacate all 130 leases at issue that were offered, sold, and/or issued at the aforementioned lease sales.

4.  Enjoin Defendants from approving or otherwise taking action on any applications for permit to drill on any of the leases that are the subject of this litigation until Defendants have fully complied with NEPA and its implementing regulations.

5.  Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein, in particular to ensure that Defendants take a hard look at the indirect and cumulative impacts of their leasing decisions.

6.  Award Plaintiffs the costs they have incurred in pursuing this action, including

attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. §

2412(d), and other applicable provisions. And,

7.  Provide such other relief as the Court deems just and proper.

Respectfully submitted this 12th day of September, 2019.

/s/ Landon Newell
Landon Newell
Stephen Bloch
Attorneys for Plaintiffs
Southern Utah Wilderness Alliance and
Living Rivers

/s/ Diana Dascalu-Joffe (with permission)
Diana Dascalu-Joffe
Attorney for Plaintiff Center for Biological
Diversity